Filed 6/14/13  P. v. Melonson CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>SIRTICE MELONSON,<br><br>Defendant and Appellant. | C061352<br><br>(Super. Ct. No. 05F10198)<br><br>ORDER MODIFYING OPINION AND DENYING REHEARING<br><br>[NO CHANGE IN JUDGMENT] |
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>SARAH WEEDEN,<br><br>Defendant and Appellant. | C061800<br><br>(Super. Ct. No. 05F10198) |

THE COURT:

It is ordered that the opinion filed herein on May 15, 2013, be modified as follows:

1

The first full paragraph on page 35, beginning with "The trial court advised" and ending with "intent to commit robbery," is modified to read as follows:

> The trial court advised defense counsel that it would consider a proposed instruction and that counsel could point out Weeden's age and immaturity during closing argument. The court later determined it would not consider such an instruction. However, during closing argument, defense counsel stressed Weeden's age and immaturity in arguing she lacked the intent to commit the robbery.

There is no change in the judgment.

Appellant Weeden's petition for rehearing is denied.

BY THE COURT:


          RAYE          , P.J.


          HULL          , J.


          BUTZ          , J.

Filed 5/15/13  P. v. Melonson CA3 (unmodified version)

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C061352 |
| Plaintiff and Respondent, | (Super. Ct. No. 05F10198) |
| v. | |
| SIRTICE MELONSON, | |
| Defendant and Appellant. | |
| THE PEOPLE, | C061800 |
| Plaintiff and Respondent, | (Super. Ct. No. 05F10198) |
| v. | |
| SARAH WEEDEN, | |
| Defendant and Appellant. | |

Seventeen-year-old Navnil Chand, his brother, and two friends approached 14-year-old defendant Sarah Weeden and some of her friends and struck up a conversation.

1

Navnil later called Weeden, who arranged to meet him a few days later. Navnil and a friend, 22-year-old Deovinesh Kumar, arrived at the assignation, where they were met by defendant Sirtice Melonson and another man. The men ordered Navnil and Kumar out of the car, and as Kumar opened his door one of the men shot into the vehicle. Navnil was attempting to open his door when multiple shots rang out. Navnil died of gunshot wounds; Kumar lost part of his finger.

An amended information charged Weeden and Melonson with murder, attempted murder, and attempted second degree robbery. (Pen. Code, §§ 187, subd. (a), 664/187, subd. (a), 664/211.)[1] Weeden and Melonson were tried jointly before separate juries. Melonson's jury found him guilty on all counts; Weeden's jury found her guilty of first degree murder and attempted second degree robbery, but found her not guilty of the attempted murder of Kumar.

The court sentenced Melonson to life in prison without possibility of parole, plus 50 years to life, plus 19 years four months. The court sentenced Weeden to 25 years to life in prison, plus four years.

Melonson appeals, contending instructional error, jury misconduct, and the trial court erred in denying him a mistrial. Weeden appeals, arguing instructional error, ineffective assistance of counsel, the court erred in removing a juror, the court erred in denying her motion for a new trial, the court erred in denying her a mistrial, the court lacked jurisdiction, her sentence constitutes cruel and unusual punishment, and sentencing error. We shall affirm the judgments.

## FACTUAL AND PROCEDURAL BACKGROUND

Following the shooting death of Navnil, an amended information charged Weeden and Melonson with his murder, the attempted murder of Kumar, and the attempted

---

[1] All further statutory references are to the Penal Code unless otherwise designated.

2

second degree robbery of Navnil and Kumar.  (§§ 187, subd. (a), 664/187, subd. (a), 664/211.)  The information also charged Melonson with possession of a firearm by a convicted felon and alleged a prior strike conviction.  (§§ 12021, subd. (a)(1), 667, subds. (b)-(i), 1170.12.)  It was further alleged that Melonson murdered Navnil while engaged in the commission of a robbery.  (§§ 211, 190.2, subd. (a)(17).)  Finally, the information alleged Melonson personally used a firearm (§ 12022.53, subd. (d)), and that Weeden, a principal, was armed (§ 12022, subd. (a)(1)).  Both Weeden and Melonson pleaded not guilty.

Weeden and Melonson were tried jointly before separate juries.  The following facts were adduced at trial.

**The Prosecution's Case**

One night in July 2005, 17-year-old Navnil Chand, his brother Shavnil Chand, and two friends, Ashneel Prakash and 22-year-old Deovinesh Kumar, were riding around in Kumar's Toyota Camry.[2]  The vehicle was new and equipped with an in-dash DVD player, chrome rims, and tinted windows.  While driving, they saw four teenaged girls walking down the street.

The group of girls consisted of 14 year olds Angela G. and Weeden, and sisters Christina W. and J.W.[3]  The boys in the Camry stopped next to the girls.  The two groups conversed.  Kumar invited the girls to "party" with them, saying his group had beer and "weed."

---

[2] For the sake of clarity we will refer to the Chand brothers by their first names.  Those minors whose identities are not being disclosed herein will be referred to by their first names or initials only.

[3] Angela and Weeden were best friends.  Angela was a cousin of J.W., Christina, and 14-year-old John W.  Those cousins were also cousins of 16-year-old Ryan Moore and 17-year-old Janee Hill.  John and Weeden dated during middle school.

The girls demurred and Angela gave Weeden's cell phone number to Navnil. After Navnil said he would call Weeden's number, the boys drove away.

The girls walked back to Christina's home. A group of boys hung out across the street. John was outside with his friends, including Ryan Moore and S.M., defendant Melonson's brother. Weeden and Angela talked with the group of boys. Weeden told them about meeting Navnil and Kumar and that they had said they had beer and weed.

Ryan Moore and Weeden talked about robbing the boys. Moore asked if Weeden had their phone number; she told him they had her number. According to Weeden, "[T]he Hindu guy's phone number was restricted."

A few days later, Moore told Hill that he was considering robbing someone. Moore stated he was going to rob "[s]ome East Indian boys" for "weed and money."

During this period, Angela asked Weeden if they were going to do the robbery. Weeden replied, "[Y]es." Angela told Weeden not to do it. According to Weeden, the robbery would take place at Vintage Park, and would yield money and drugs.

John heard from Weeden and Angela that there was going to be a robbery. Weeden asked him to rob the boys they had met the week before. John refused.

A week later, on August 5, 2005, Weeden called Hill and asked for Angela; Hill told her Angela was at home. Although Angela was supposed to see Weeden that day, Angela's mother forbade her from leaving the house.

That evening, Weeden called Hill and talked about boys that kept "crank calling" her phone; she wanted to have them beaten up. Weeden told Hill the boys were trying to get her to go to a motel. Weeden also told Hill she was going to have Moore rob the boys, who kept calling her. She told Hill she met the boys while walking with Hill's cousins. Moore planned the robbery, which would net Weeden weed and money.

Hill warned Weeden that robberies can go wrong and bad things can happen. Weeden responded, "[O]kay."

4

Also that evening, Navnil called Kumar and asked him to call Weeden's cell phone. Although Kumar called, no one answered. Navnil later called Kumar and told him he needed money; he said it was urgent but did not tell him what it was for. Kumar owed him $60. The duo agreed to meet at an ATM to get the money.

Kumar picked up Navnil, and as the pair drove to the ATM, Navnil talked to someone on his cell phone, trying to get a room at the Motel 6. Navnil used Kumar's phone to call the girl he was meeting. Kumar did not hear Navnil mention drugs or alcohol.

Navnil, while talking on the phone, directed Kumar's route. Navnil told Kumar the girls they met previously were going to meet them at the park. Navnil made numerous calls.

Kumar parked on a side street adjacent to the park, leaving his engine running. Navnil spoke to a girl who said, "I'll be there in two to three minutes." Navnil replied, "I'm waiting for you over here by the park." Navnil told Kumar they should leave the car because the girls told them to go to the park.

**The Shooting**

A few seconds later, two men appeared at the front passenger side of the car. The window was down about five inches. One of the men stuck a handgun in the window and said, "Mother fuckers, get out of the car."

Thinking the man wanted the car, Kumar began to open his door; Navnil did the same. As Kumar opened the door, the man fired a shot into the car. Kumar saw blood and thought his hand had been cut by broken windshield glass. He put the car in drive and sped off, yelling for Navnil to call the police.

As he drove away, Kumar heard more gunfire. He pulled into a store parking lot and ran inside the store.

A store security guard saw Kumar's Camry speeding into the parking lot. Kumar jumped out and yelled that he had been shot. The store clerk saw Kumar enter the store and fall to the floor. Kumar then got up and went back outside.

Kumar went back to the car and shook Navnil, who did not respond. The security guard saw Navnil sitting upright in the passenger seat, barely breathing. Kumar returned to the store and again fell to the floor. The clerk went to Kumar's aid and saw that part of Kumar's finger was gone. Kumar said he did not want to die. The clerk locked the store and the security guard called the police.

**Witnesses in the Park**

The evening of the shooting, 13 year olds Brittany R. and Vaughn T. sat on playground equipment in the park. A car pulled up and two men walked up to the children.

One of the men was shorter and heavyset, with short hair and wearing gold teeth. This man also had light skin. Brittany thought "[h]e looked like he was mixed with black and white." Vaughn thought the shorter man looked mixed "Black Mexican." Brittany thought the man was 16 or 18 years old, and maybe five feet six inches tall. He wore a red shirt or sweater and sweat pants or basketball shorts, and carried a backpack.

The second man was African American. He was tall and skinny, with braids and a darker complexion. The man wore a "do rag," a kind of head wrap, on his head. Both men carried cell phones.[4]

The pair sat down next to Brittany and Vaughn. The taller man spoke to a girl on his cell phone. The shorter man said, "[W]e're going to make a lick [commit a robbery]" to the person on the phone.

---

[4] Neither Brittany nor Vaughn identified Melonson from the photographic lineup or at trial.

One man asked the other, "[A]re these guys gonna get out of the car or what?" The shorter man told the taller man that the men in the car were Indian, and that Indians do not carry guns, only Pakistanis do.

The men asked Brittany and Vaughn to go over to the car and distract the occupants while they came up from behind. Brittany refused. Vaughn told a detective the taller man said, "They ain't trying to get out of the car, let's go." The shorter man at first demurred, but after the taller man insisted, they walked toward the car, approaching the passenger side.

The shorter man stood close to the window; the taller man stood back by the trunk. The shorter man pointed a gun and began shooting into the car through the passenger window. Brittany heard two or three shots; she did not see anyone get out of the car. Vaughn heard three or four shots and saw the shorter man shooting at the person inside the car on the passenger side.

After the shooting, the two men ran. Brittany and Vaughn ran to Brittany's house.

Renice Trujillo, who lived in a court near the park, also heard gunshots that evening. She looked out her window and saw two people walking quickly into the court. They were male, tall and lanky. One wore layered red and white shirts. One of them was talking into a cell phone and mentioned the park. Another neighbor heard five loud pops.

Doug Reid, another neighbor, heard "extremely loud" gunshots that he thought sounded like a large-caliber handgun. He looked out his window and saw two young men walking quickly down the court. One of the men looked Hispanic; the other looked African American. The Hispanic man wore a dark shirt and a backwards baseball cap, and carried a backpack. The other wore a red sweatshirt and a do-rag.

Reid saw the two men jump onto the wall at the end of the court. The men looked around and the Hispanic man dropped the backpack, which appeared to be heavy. The men jumped off the wall and walked away. Reid described the men as suspicious; he

7

also identified the backpack and sweatshirt found next to the wall as those worn by the men.

Daniel Albano, another nearby resident, heard three or four gunshots. He looked out the window and saw two individuals running toward his house. One wore a red or orange sweatshirt and long shorts, and was around five feet seven inches tall and slender. The other person was dressed in black.

Finally, Thorlakur Tryggvason, who also lived in the area, heard five gunshots coming from the park. Looking out his window, he saw one female and five males running from the park. Two of the males ran past his house, entered the next cul-de-sac, and jumped the fence at the end of the court. He described the males as teenagers, either Asian or Hispanic and African American, of average height and build.

**Weeden's Activities the Night of the Murder**

Weeden called Hill repeatedly that night to have her get in touch with Moore. Weeden asked Hill to call Moore and find out where he was. Moore said he was on his way home. Weeden called later, again asking where Moore was. Moore said he was getting a ride from defendant Melonson and did not seem surprised that Weeden wanted to know where he was.

While Hill spoke with Weeden, the boys she had met that night kept "buzzing in" on Weeden's phone. Weeden told Hill to ask Moore whether he was at the park. Moore said he was at the big park, and after Hill told Weeden, she said "[O]kay." Weeden told Hill to ask Moore if he saw the boys at the park and if he saw the boys' gold car. Moore did not see the car.

Weeden told Hill to tell Moore to go to Caymus Park. Weeden then told Hill to ask Moore if he saw the boys at that park, and Moore said he saw a gold car. Weeden said, "[T]hat's them." Weeden told Moore there had been two or three boys in the car. Hill spoke to Melonson once or twice on Moore's phone. Moore hung up and Hill did not speak with him again that evening.

8

Later that evening, Melonson called Hill and told her to keep quiet if anyone asked questions and to turn off her phone. Angela told Hill someone had been shot. Hill tried to contact Moore but could not reach him. Hill also called Weeden, but Weeden had not heard from Moore. A week or two after the murder, Melonson called Hill and told her not to talk to the police.

**The Aftermath**

Sheriff's deputies responded to the shooting. Navnil sat bleeding and unresponsive in the front passenger seat. The Camry had broken glass and bullet holes on the passenger side.

Kumar lay on the floor of the store, covered in blood. Kumar told responders the shooting had occurred at a nearby gas station. He described the assailants as two dark-skinned black males wearing shorts.

Navnil suffered gunshot wounds to his back and hand. The fatal wound was caused by a bullet that entered his back and perforated his lung and heart. The entrance wound was irregularly shaped, which indicated the bullet struck something before entering Navnil's body. Navnil did not have drugs or alcohol in his system. Kumar had been shot in the finger, losing part of it.

**The Investigation**

Detectives Christopher Joachim and Grant Stomsvik were assigned to investigate the shooting. Their examination of the Camry revealed the car had very dark tinted windows, after-market rims, and low-profile tires.

The passenger-side windows were shattered and the car had four or five bullet holes. The right rear passenger window and the right front passenger window had bullet holes. Other bullets passed through the right rear passenger door and the base of the right front passenger window. Two of the bullets appeared to have been shot either as the car was moving away or the shooter was moving toward the rear of the vehicle.

The investigation also revealed damage to the Camry's interior. The windshield had been hit and blood was pooling in the center console area. A cell phone charger was plugged into the cigarette lighter. Copper jacketing from a bullet was also found inside the car.

Detectives found a bullet fragment on the driver's seat between the seat and the back cushion. In Detective Joachim's opinion, based on the physical evidence and witness statements, there was one shooter and one gun, and all the shots came from outside the vehicle.

The investigation also revealed Kumar's wallet on the Camry's floorboard. It contained a debit card but no cash.

Kumar talked to the police at the hospital. Although Kumar initially said the shooting took place at a supermarket gas station, he testified that he had lost a lot of blood and was not thinking clearly at the time.

The next morning, after police told Kumar about Navnil's death, Detective Stomsvik drove Kumar back to the park. Kumar told the detective that Navnil talked on his cell phone to a girl who told him to go to the park. Navnil told the girl he was at the park, and Kumar heard the girl reply that she could be there in two or three minutes. Kumar heard the girl tell Navnil to sit on a bench.

After Kumar parked, two men came up to the passenger-side window of his car. Kumar saw a gun come through the window, and the person said, "[G]ive me everything you have and step out of the car." As Navnil opened the door, he hit the man's arm.

The man fired one shot that Kumar thought hit the windshield. Kumar started to drive away as more shots were fired. The shooter was a fair-skinned Asian male, 18 to 20 years old, five feet nine inches tall with a heavy build, and wearing an orange shirt. However, Kumar could not identify either of the two suspects in a photo lineup.

The morning after the shooting, Doug Reid approached a deputy securing the crime scene at the park. Reid told the deputy he knew something about the shooting and

10

took the deputy to his nearby home. Reid showed the deputy the wall that someone had scaled the previous evening.

The deputy drove around to the other side of the wall and discovered a revolver, a backpack, and a red sweatshirt in the vegetation along the wall. The backpack contained shorts, boxer shorts, a pencil, and razors. The DNA extracted from one of the razors matched Melonson's genetic profile.

The revolver held six rounds but contained only one casing when found. Officers found five empty shell casings loose on the curb. DNA extracted from the revolver's grip contained a mix of DNA from at least three individuals. Melonson was excluded as being a possible contributor to this mixture.

A forensic expert testified the bullet recovered from Navnil's body could not be matched to a particular gun because the bullet core did not make contact with the barrel of the weapon or the barrel's rifling. Nor could the lead fragment recovered from Navnil's body be matched.

The forensic expert test-fired the revolver found by the wall to compare it with evidence found at the scene. Three of the casings found by the wall were fired by the revolver. Two other casings were likely fired by the revolver. The copper jacketing found in the Camry was likely fired by the revolver.

**Melonson's Arrest**

About a month later, officers searched the home of Melonson's uncle, where Melonson sometimes stayed. Officers found six boxes of Winchester .357-Magnum shells in the garage; five boxes were full, containing 50 cartridges, and one box contained only 48. Melonson's uncle testified that his garage had been broken into months before and three boxes of shells were stolen.

One of Melonson's friends, Shakti Rana, owned a .357-caliber revolver, which looked like the gun found in the bushes near the park. Melonson's brother, S.M., stated

11

that Melonson and Rana shared a gun in July and August 2005 but denied the gun found in the bushes was the same gun.

Melonson's girlfriend, Julie G., had been dating him for about a year at the time of the shooting. Julie gave Melonson a backpack, which he used to carry clothes and toiletries. She identified the backpack found in the bushes as the backpack she gave Melonson. Julie identified the shorts found in the backpack as belonging to Melonson. That summer, Melonson told Julie someone had stolen his backpack.

Gabrielle Perez, a friend of Melonson, was driving home one evening in 2005 when she saw police in her neighborhood. Later that night, Melonson sent Perez a text message stating he had "popped someone" and needed to talk. Melonson called Perez the next morning and told her he shot someone and threw away his "piece." He feared that if the police found it they would find him. Cell phone records showed the text message was sent and the call was made on August 5 and August 6, 2005. Melonson changed his phone number a few days later.

Melonson's friend Chris Butler moved from Sacramento to Denver, Colorado, in 2005. While in Sacramento, Butler had a cell phone that did not provide service in Denver. He got a new phone in Denver and left his prepaid cell phone with his girlfriend. Butler's girlfriend did not know Julie, Perez, Moore, Rana, or Hill. Butler was in Denver from July to early September 2005. He went to pick up Melonson at a bus terminal in Denver in November 2005, but officers arrested Melonson at the station.

When arrested at the bus station, Melonson was 20 years old, five feet seven inches tall, and 185 pounds. Melonson carried a cell phone, prepaid calling card, and a one-way bus ticket to Denver in the name of "Mr. Brown." During the booking process, Melonson told officers he was "not looking for the best deal in the world. He was looking to make sure he got out of prison by the time he was 45 or 50."

The prosecution presented extensive evidence of numerous phone calls and text messages among the various parties.

12

**Cell Phone Calls**

Cell phone records for Navnil's, Weeden's, Melonson's, Moore's, Hill's, and Kumar's phones were introduced.[5]  The phone number for Melonson's phone was changed on August 6, 2005, and again on September 7, 2005.  Weeden changed her number after the murder.

Numerous phone calls were made by Navnil to Weeden beginning late on the evening of July 29, 2005, and ending on the night of the shooting.  The calls were very brief and many went straight to voice mail.

Late in the afternoon prior to the shooting, Navnil began calling Weeden from his cell phone.  There were also several calls to Weeden from Kumar's cell phone.  Navnil's cell phone blocked caller identification, preventing the recipient from identifying the caller.  Twenty-nine calls were placed to Weeden from Navnil's and Kumar's phones; she did not answer 13 of the calls.  The calls continued up until the time of the shooting.

Navnil called Weeden for the last time at 10:59 p.m., but Weeden was already on the phone with someone else and did not answer.  At 11:03 p.m., Navnil called 911.  Navnil made no calls to Melonson, Moore, or Hill.

Shortly after the first call from Navnil on the night of the murder, Weeden and Hill began calling each other.  There was a 41-minute phone call from Weeden's cell phone to Hill's home phone that ended at the time of the murder.  Immediately after the murder, there was a 26-minute phone call between Weeden's cell phone and Hill's cell phone.  Later in the evening there were a few brief calls between Weeden's cell phone and Hill's cell phone.  Weeden did not call Navnil or Melonson.

Moore first called Melonson the day before the murder.  Melonson returned the call.  Melonson called Moore at 6:07 the evening of the shooting.  There were 17 calls

---

[5]  The subscriber on Melonson's phone was actually Chris Butler, who, as noted previously, had given the phone to Melonson when Butler moved to Denver.

between Moore and Weeden on the night of the murder.  The calls began when Moore called Weeden at 9:30 p.m. and then called Melonson at 9:31 p.m.  The calls between Moore and Melonson ended at 10:06 p.m.  The calls between Moore and Weeden ended at 10:42 p.m.

Hill called Moore 18 times the night of the murder.  The calls began about 12 minutes before the murder and continued after the murder.  Moore never called Hill.

Cell phone tower data showed Moore's and Melonson's phones were being used in the area of the park between 10:00 and 11:00 p.m. the night of the murder.  Navnil's cell phone was in the vicinity of the park at 11:00 p.m.  Hill's and Weeden's cell phones were in a different part of town.

At 11:04 p.m., immediately after the murder, Melonson called Rana.  Numerous calls between the two followed.  Melonson also tried to call Perez one to two hours after the shooting.  They spoke briefly the morning after.

**Text Messages**

In November 2005 Detective Joachim directed Moore to send a text message to Weeden over their cell phones.  Another officer took a photo of each message.

Weeden told Moore she was moving to Los Angeles.  Moore said, "[O]h, you movin' because of what happened with the Sirtice thingy," and Weeden answered, "Nah, I don't even really care about that, but den I kind of do because someone keep [*sic*] calling me saying they gonna kill me.  I wasn't even the one that told on him."

Moore asked Weeden if she had told her father about what Moore had done.  Weeden responded:  "[N]o, all I told him was you my friend and you didn't do anything."  Moore falsely told Weeden that in order to get a deal, Melonson had told the police about what she and Moore had done.  Weeden asked what kind of deal Melonson made and if Moore was going to be arrested.

Moore said it was all Weeden's fault because she met the "hindus."  Weeden responded:  "[D]is ain't my fucking fault.  Sirtice should [*sic*] have done what he did.  He

14

brought you into that by doing that. This shit wasn't my fault, so don't even fucking say it was." Weeden said, "[I]t's Angie's fucking fault, dummy. She da one that went to the car and gave them my number."

Moore replied: "[I]t was yo fucking idea to even rob them." Weeden denied this and blamed Angela, asking Moore, "Why you trying to put this on me? It wasn't my fucking idea. It was Angie's, so shut up. They already know it was."

Weeden continued: "I didn't set nuttin' up." She admitted knowing Melonson was going to rob the boys: "I already fuckin told them I knew Sirtice was going to rob them. They already know what I did. I told the truth, but I didn't set this up, okay." Weeden said she was "hella scared" and did not want either of them to go to jail.

Moore asked Weeden what she had told the police about the robbery and she replied: "I told them that someone told me to tell them to meet me at the park, and that Sirtice was gonna be there to rob them, but I didn't tell them who told me to set it up." Weeden blamed Hill, saying, "And you know dis all Janee fault because she told them some shit, then they got her phone records and mine den yours." Weeden advised Moore: "If you want to get out of this, you have to give up Angie's name."

**Statements by Participants**

*Angela G.*

In November 2005 Detective Joachim interviewed Angela about the night of the murder. Angela told the detective that Weeden was telling everyone about the previous meeting with Navnil, Kumar, and the other boys. She said the boys had weed and beer.

Weeden talked extensively to Moore about meeting the boys. Moore suggested they rob them. Weeden agreed and said, "[Y]eah, we should." Moore asked Weeden if she had the "Hindu guy's" number and she told him he had her number. Angela told Weeden not to do the robbery, but Moore said he and "Teze" should rob the boys.

15

After Angela passed the victim's car, she asked Weeden if they went through with the robbery. Weeden denied it. After the murder, Weeden did not want to discuss it over the phone.

### John W.

In December 2005 Detectives Joachim and Stomsvik interviewed John. John indicated Weeden planned out the robbery. He overheard Weeden telling Angela about someone Moore was going to rob.

### Janee Hill

Detectives also interviewed Hill in December 2005. The day before the murder, Moore told Hill he was planning to rob someone. Hill attempted to dissuade Moore by telling him robberies often end up in murder. Moore agreed and told Hill he was not going to rob them. Later Weeden told Hill that Melonson and Moore were going to commit the robbery.

The night of the shooting, Weeden called Hill and had her talk to Moore to find out where he was. Moore or Melonson directed Hill to ask Weeden about what the boys were driving and which park they were going to. Hill believed Weeden, Melonson, and Moore had the robbery planned before Hill became involved. Initially Moore and Melonson went to a different park but relocated when they realized which park the boys were at.

### S.M.

In November 2005 Detective Stomsvik interviewed Melonson's brother S.M. S.M. stated that Melonson and Rana bought a gun together. He recognized the gun found in the bushes as Melonson's gun and the sweatshirt found in the bushes as a sweatshirt that he and his brother wore. S.M. also identified the backpack, the razors, and the shorts as his brother's.

16

In a second interview, S.M. said he was at a park near Rana's house with Rana, Moore, and Shatez the night of the shooting.**6** Moore gave his phone to Melonson, who sent a text message to Julie. Melonson then gave the phone back to Moore. At that time, Melonson was using two phone numbers: Butler had given him his phone after he moved. The night of the murder, S.M. was not with Melonson but was "laser bowling" with friends and his brothers Idrice and Shatez.

Following the shooting, Melonson, Shatez, and Rana told S.M. he needed to find Rana's gun. S.M. searched for the gun in the bushes three times after the murder. Accompanied by Shatez, Moore, and John, S.M. failed in several attempts to find the gun.

### Shakti Rana

A district attorney investigator interviewed Rana in July 2007. Rana stated he and Melonson had a gun that they "passed back and forth." Rana had the gun the day before the shooting, then gave it to Melonson because Melonson said he "wanted it for something." Rana identified the gun found in the bushes as the gun he and Melonson shared.

The night of the shooting, Melonson called Rana and asked for a ride. Melonson sounded shaky on the phone. Rana picked up Melonson and another person who "looked nervous and stuff. . . . [¶] . . . [¶] . . . It looked like something went down." According to Rana, "I knew something was wrong just the way he was acting . . . . He was just real . . . I never seen him like that. He was real shaky, panicky . . . ."

Melonson did not say much "because he was just on the hush-hush." Although Melonson did not mention the murder, Rana stated, "[H]e knows what he did was wrong. You know what I'm saying? He knew that . . . we was good enough friends to know that

---

**6** Melonson's brother Shatez is referred to in the record as Shatez, Shateze, Tezi, and Tezzi.

17

he knew exactly what I meant by like how the hell you going to put me in a position without letting me know?"

During the trial, Idrice, who lived with S.M. and Melonson's uncle, visited Rana, who was in jail on contempt charges, to discuss his testimony.[7] Idrice tried to dissuade Rana from testifying, telling Rana that if he testified and only rapped "one verse," that Rana's prior statements to detectives would be admitted into evidence and "[i]t will be bad." Idrice told Rana, "[I]f they have your music and your . . . name is on the track, it's the audience, your fans, your fans is going to be like, oh, wow. Automatically."

Idrice told Rana he could be out of jail in a few weeks. Idrice suggested to Rana: "[y]ou can rap the . . . five lyrics, you know what I'm saying, the five?" Rana said he needed to take care of his daughter, and Idrice responded: "If you need money on your books, let us know. [¶] . . . [¶] . . . We're going to take care of you . . . ." Idrice offered to get diapers and told Rana, "Sacrifice is the ultimate key."

Rana told Idrice: "I slipped up and must have just said a little extra, a little few little verses here and there. I slipped up, but I know for a fact everybody else was way worse . . . . [¶] . . . [¶] . . . My song wasn't that good, but it's good. It's still solid, sort of solid."

Rana told Idrice to tell "Cuzzie" that he had Rana's "dope" and to "keep flipping and doubling it." Idrice told Rana, "It's all up to you right now. [¶] . . . [¶] . . . This is going to determine everything." Idrice also told Rana everybody was counting on him, even "the white boy downstairs."

---

[7] The jury heard a tape recording of the conversation.

### Melonson's Phone Call

During the trial, Melonson spoke to his mother and Idrice by phone. Melonson asked his mother, "[H]ow's it lookin' from the audience point of view?" His mother told him it looked good and Melonson replied: "[A]in't nobody identify me . . . as the dude."

Melonson's mother told him to stop talking about the case and said, "they can't convict you with the evidence they got." His mother mentioned Kumar, noting "He scared. He don't know. He . . . got no family up there with him. Nobody's helping support this."

Melonson's mother also stated, "The DA's case is tankin' really fast. [¶] . . . [¶] . . . the witnesses that the State is calling are not doing what . . . the State want them to do." Melonson told his mother, "I know. . . . [¶] . . . [¶] . . . Everything [is] going my way."

Melonson also told his mother that he frequently looked at the jury because he did not want the jurors to think he was trying to avoid them. He asked his mother whether he looked mad, and she reassured him that he looked very calm.

Melonson and his mother discussed the prospect of Rana's testimony. Melonson said he needed to talk to "Dreecy." Melonson told his mother, "Tell him . . . this is the biggest visit I'm gonna have with him . . . . [¶] . . . [¶] . . . Cuz my case is looking too good for him to slack on me right now."

Melonson asked his mother to tell "Dre" that "I need them to come . . . to court on Monday when Shakti on the stand -- because that's they [*sic*] best friends." Melonson also asked his mother to tell "Dre" not to "be coming up here looking like no damn thug like he was today."

Melonson's mother asked him, "You ain't admitted to nothin', right?" He responded, "Heck, no."

Melonson also mentioned his remark during booking about hoping to get out before he was 40 or 50 years old and said, "I'll damage control that . . . . I might have to

19

get on the stand myself." Melonson also reassured his mother about his attorney's capabilities. Idrice visited Melonson in jail the following day and a few days after that.

**Defense Case**

The defense called character witnesses who testified that Weeden's character was not consistent with someone who would set up a robbery. Kim Gibson, a family friend who had known Weeden her whole life, testified Weeden did not have the character of someone who would set up a robbery. Gibson described Weeden as a "generous, considerate, loving person."

Linda Matson, whose children Weeden babysat, also testified Weeden was not capable of planning a robbery because Weeden had "always been a very sweet person, very responsible, just nice, kind, not nobody that would do something like that."

Weeden's great-aunt testified that Weeden would not set up a robbery because she was a "kind, caring, bashful, shy, young lady, and she cares about others. She's considerate. She minds her parents. She's just a good girl." Weeden's grandmother echoed these sentiments, stating Weeden would not engineer a robbery because she was "much too caring and much too kind, considerate. She would never do that."

**Verdict**

The Melonson jury found him guilty on all counts and found all enhancement allegations true.[8] Two days later a juror from Weeden's panel was discharged for misconduct and replaced by an alternate. Five days after that, a second juror was discharged for misconduct and failure to follow the court's instructions, and was replaced by an alternate.

That day, after the second juror was replaced, the jury found Weeden guilty of the first degree murder of Navnil and the attempted second degree robbery of Navnil and

---

[8] Melonson filed a motion for the release of juror information. The court denied the motion following a hearing.

Kumar, and found the arming enhancement allegations true.  The jury found Weeden not guilty of the attempted murder of Kumar.

**Motion for a New Trial**

Weeden filed a motion for a new trial, arguing (1) jurisdiction of the trial court was improperly invoked, (2) ineffective assistance of counsel based on counsel's failure to call Weeden to testify and counsel's failure to have Weeden examined by a psychologist, (3) Weeden was denied a fair trial by her inability to testify effectively due to her age and immaturity, (4) instructional error, (5) improper removal of a juror, (6) juror misconduct, and (7) new information revealed a juror was improperly seated. Following a hearing, the court denied the motion.

**Sentencing**

The court sentenced Melonson to life in prison without the possibility of parole, plus 50 years to life, plus 19 years four months:  life without parole for first degree murder, plus 25 years to life for the firearm use enhancement; 18 years, to be served consecutively, for attempted murder, plus a consecutive 25 years to life for the firearm use enhancement; and 16 months, also to be served consecutively, for possession of a firearm by a convicted felon.  On the attempted second degree robbery counts, the trial court imposed and stayed, pursuant to section 654, a sentence of 16 months, plus a term of 25 years to life for the firearm use enhancements as to those counts.  Melonson filed a timely notice of appeal.

The court sentenced Weeden to 25 years to life in prison, plus four years:  25 years to life for first degree murder, plus one year for the firearm use enhancement; and two years, to be served consecutively, for attempted second degree robbery, plus one year for the firearm enhancement.  On one robbery count, the court imposed and stayed, pursuant to section 654, the midterm of two years, plus one year for the firearm enhancement. Weeden filed a timely notice of appeal.

## DISCUSSION

## MELONSON'S APPEAL

**Instructional Error**

Melonson argues the trial court erred in instructing the jury on accomplice liability in violation of his rights under the Sixth and Fourteenth Amendments to the United States Constitution. According to Melonson, the court erred by failing to refer to all possible accomplices, omitting S.M. and Rana. In addition, Melonson faults the court for not instructing that Angela and Hill were accomplices as a matter of law.

*Background*

Melonson's counsel requested that the court give the accomplice testimony instruction, CALCRIM No. 334, applying it to Hill, Angela, and S.M. Counsel argued that, based on the trial testimony, the jury could believe one of two things: either S.M. shot Navnil, or he knew of the intended robbery and aided and abetted it. S.M. was present or nearby when Weeden and Moore discussed the robbery. He also admitted being in the park on the night of the murder. In addition, counsel pointed out that S.M. matched the description of the shooter and admitted handling the gun.

The prosecution countered that, at most, S.M. was an accessory after the fact in his fruitless search for the weapon after the shooting. No evidence, the prosecution maintained, pointed to S.M. as the shooter, and S.M. was at a different park prior to the shooting.

The court denied defense counsel's request, noting: "I agree that there is testimony that at some point in time he touched that gun. There is testimony that he overheard and might have overheard that a robbery was going to be committed, although I think that is fairly murky . . . clearly the law is you can know about a crime being committed and do nothing to aid, facilitate, encourage or promote. There is no criminal liability, and I think 334 is an instruction required where you clearly have an accomplice or at least an arguable accomplice. I don't see [S.M.] as an arguable accomplice. He is

certainly an accessory after the fact. The jury is going to be given instructions that will cause them pause when they consider his testimony and rightfully so. [¶] In addition to just the general credibility instruction that they will be given, I think you have ample evidence and circumstantial evidence to argue the questionable nature of [S.M.'s] testimony. I do not think, however, that he is an accomplice under the 334 instruction, so I will decline to give that instruction." The court instructed pursuant to CALCRIM No. 334 as to Angela and Hill.

### *Discussion*

Section 1111 states: "A conviction cannot be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof. An accomplice is hereby defined as one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given."

If there is evidence from which the jury could find that a witness is an accomplice to the crime charged, the court must instruct the jury on accomplice testimony. The defendant bears the burden to prove, by a preponderance of the evidence, that a particular witness was an accomplice whose testimony requires corroboration. (*People v. Williams* (1997) 16 Cal.4th 153, 247.)

A witness's mere knowledge of a defendant's criminal intent, without more, does not satisfy this burden. Nor is the witness's presence at the scene, or failure to prevent a crime, sufficient to demonstrate guilt as an aider and abettor. (*People v. Nguyen* (1993) 21 Cal.App.4th 518, 529-530.)

### **Angela G. and Janee Hill**

Melonson argues the court erred in not instructing that Angela and Hill were accomplices as a matter of law. Whether or not a witness is an accomplice is a question

for the jury, unless there is no dispute as to the facts or the inferences to be drawn from the facts. The trial court may determine a witness is or is not an accomplice only when such facts are clear and undisputed. (*People v. Anderson* (1987) 43 Cal.3d 1104, 1138; *People v. Rodriguez* (1986) 42 Cal.3d 730, 759.)

According to Melonson, the "record leaves no room for any determination bu[t] that both Grace and Hill were liable for prosecution as aider and abettors of the robbery plan and the natural and probable consequences theory of liability." We disagree.

As for Angela's connection to the crimes, she was with Weeden when they met the victims and gave Weeden's cell phone number to Navnil. Angela overheard Weeden and Moore discussing the robbery and was aware of the plan because of her relationship with the duo.

However, when Weeden told Angela about the plan to rob the boys, Angela attempted to dissuade her, to no avail. Angela was not with Weeden, Moore, Hill, or Melonson the night of the murder; instead, she was at home. There is no evidence she communicated with any of the participants. Angela testified she did not know if "they were gonna do a robbery or not."

Although Melonson argues the evidence reveals Angela knowingly and intentionally aided and abetted in the murder, such liability depends upon whether the individual promotes, encourages, or assists the perpetrator and shares the criminal purpose. "It is not sufficient that he merely gives assistance with knowledge of the perpetrator's criminal purpose." (*People v. Sully* (1991) 53 Cal.3d 1195, 1227 (*Sully*).) Here, although Angela was aware of the robbery plan, there is no evidence to support the inference that she shared Melonson's criminal plans.

Similarly, Hill's participation does not rise to the level of an accomplice as a matter of law. Hill heard from Moore about the scheme to rob the boys the day before the shooting. The night of the shooting, Weeden told Hill she was going to help Moore rob the boys. Hill testified, "I really didn't understand they was gonna rob the boys."

24

Hill told Weeden not to do it but remained involved by relaying information by phone among Weeden, Moore, and Melonson. Hill, as instructed by Weeden, directed Moore and Melonson to the right park and gave them information about the prospective victims. Hill was charged with murder and robbery, and tried as an adult. She pleaded guilty to the robbery charge and agreed to testify in court.

Hill knew of, and assisted, Weeden in the planning of the robbery, but it is not clear and undisputed that she shared Melonson's criminal purpose. (*Sully*, *supra*, 53 Cal.3d at p. 1227.) Whether or not Hill was an accomplice was properly left to the jury to determine; the evidence did not support an instruction that Hill was an accomplice as a matter of law.[9]

### Shakti Rana and S.M.

Melonson also contends the trial court erred in excluding Rana and S.M. in the accomplice instruction. According to defendant, the trial court should have instructed that the jury needed to determine whether S.M. and Rana were Melonson's accomplices and, if they were, that their testimony should be viewed with distrust. At trial, Melonson's counsel requested that S.M. be included in the accomplice instruction but did not include Rana in the request.

The trial court has the duty to instruct the jury sua sponte to determine whether a prosecution witness was an accomplice if supported by the evidence at trial. (*People v. Zapien* (1993) 4 Cal.4th 929, 982.) The evidence must be substantial, not speculative. (*People v. Lewis* (2001) 26 Cal.4th 334, 369.)

---

[9] Nor does the fact that Hill pleaded guilty to robbery change our conclusion. Such a plea does not, in and of itself, determine her status as an accomplice. It remains a question for the jury. (*People v. Martinez* (1982) 132 Cal.App.3d 119, 130; *People v. Williams* (1970) 10 Cal.App.3d 638, 641.)

25

As evidence of Rana's status as an accomplice, Melonson argues Rana gave him the gun the day before the murder. However, Rana testified he did not know why Melonson, with whom he shared the gun, wanted it. Although Rana picked up Melonson after the shooting, Melonson never told him about the crime. Rana thought Melonson had been in a fight. Rana's involvement in the shooting did not amount to encouraging, facilitating, or assisting in the robbery. The trial court did not err in failing to instruct that Rana might be considered an accomplice.

Similarly, S.M.'s involvement did not support an accomplice instruction. S.M. knew of the robbery plan and helped look for the gun after the shooting, but there is no evidence that he shared Melonson's criminal purpose. His knowledge before the crime and assistance after the crime did not make him an accomplice. Again, the court did not err in failing to include S.M. in the accomplice instruction.

## Potential Juror Misconduct

Melonson argues the trial court abused its discretion in denying his petition for access to juror information. Melonson posits two instances of potential juror misconduct, which he contends necessitated the release of juror information. In the first, Gabrielle Perez's mother signaled to her daughter that she should change her testimony. In the second, Weeden told her counsel that she saw a member of Melonson's jury reading the Sacramento Bee on December 3, 2008, during deliberations. Melonson contends the trial court's denial of his request for juror information violated his Sixth and Fourteenth Amendment rights.

### Background

Prior to sentencing, Melonson filed a motion for release of juror information to determine whether juror misconduct had occurred. Melonson's counsel attached a declaration stating that following the verdict, he spoke with a juror who told him that "while prosecution witness Gabrielle Perez was testifying, a woman he believed to be her mother was present in the back of the court room, signaling to her daughter during a

26

specific portion of the testimony that her testimony should be changed." According to counsel, this occurred while Perez testified regarding the date on which she received text messages from Melonson about the shooting. The juror stated he believed several other jurors observed the conduct.

The second instance of potential misconduct occurred on the morning the jury returned its verdict. Weeden saw a juror in a hallway of the courthouse reading the Sacramento Bee, then passing a portion of the paper to another juror. That issue of the Sacramento Bee contained an article on the trial which quoted text messages that had been excluded at trial. Defense counsel did not know if either juror read that particular article.

In opposing the motion, the prosecution argued the first instance of alleged misconduct was spectator misconduct, not juror misconduct. The prosecution stated it was obvious Perez was mistaken on the date but that other evidence, including the detective's testimony and cell phone records, revealed the message was sent a few hours after the shooting. As to the second alleged instance of misconduct, defense counsel presented no evidence any juror read the article in question. Defense counsel requested permission to explore how many jurors witnessed the spectator's attempt to influence Perez's testimony, and to determine whether any jurors read the article.

The court denied the motion. The court reasoned that the jury had been instructed with CALCRIM No. 222, which directed it to consider only the evidence presented at trial. Therefore, "an attempt by a spectator to coach a witness is not contemplated in that jury instruction. And case law is clear that jurors are presumed to have followed the Court's instructions if properly instructed as this jury was. [¶] Whether a person in the audience attempted to or did coach a witness is not misconduct by a juror. Had this Court observed such behavior, that person would have been removed and the jury given an admonishment as one spectator was during the testimony of John Williams. [¶] In any event, it is the Court's recollection that [defense counsel] did an excellent job at

27

questioning the witness on the date and times of the relevant text calls, and notwithstanding significant evidence to the contrary and . . . even if this Court was to presume coaching by a spectator, the witness continued to believe that these text messages and phone calls were received at a time that was contradicted by the better evidence in the case, which was phone records from the cellular carrier. [¶] Regardless, the jury did not commit misconduct even if they observed a witness being coached. Evidence Code Section 1150 expressly excludes evidence to show the effect of such statement, conduct, condition or event upon a juror either influencing to assent or dissent from the verdict, or concerning the mental processes by which it was determined. [¶] This allegation, even if true, would require an inquiry into the mental processes of the jurors and, as such, would not constitute good cause to unseal the confidential juror identifying information."

As for the second instance, the court found the allegation regarding the newspaper article was "highly speculative and, as such, it fails to establish good cause for the unsealing of the confidential information." The court noted it had instructed the jury not to read or listen to news accounts of the case and found the fact that some jurors might have read the newspaper on the date the article appeared was wholly insufficient to unseal confidential juror information. After weighing defendant's rights against the juror's expectations of confidentiality, the court found good cause did not exist to unseal the documents.

### *Discussion*

Following recording of the verdict, the jurors' personal information is sealed. (Code Civ. Proc., § 237, subd. (a)(2).) A defendant may request the information by submitting a declaration with facts sufficient to establish good cause for the release of the information. (Code Civ. Proc., §§ 206, subd. (g), 237, subd. (b).) Defendant must make a sufficient showing (1) to support a reasonable belief that juror misconduct occurred, (2) that diligent efforts were made to contact the jurors through other means, and (3) that

28

further investigation is necessary to provide the court with adequate information to rule on a new trial motion. (*People v. Wilson* (1996) 43 Cal.App.4th 839, 850 (*Wilson*).) Defendant bears the burden of establishing good cause. (*People v. Granish* (1996) 41 Cal.App.4th 1117, 1131.)

The trial court possesses broad discretion in determining whether a request for juror information should be granted. We review the court's denial of such a request for an abuse of discretion. (*People v. Carrasco* (2008) 163 Cal.App.4th 978, 991; *People v. Santos* (2007) 147 Cal.App.4th 965, 978.)

We agree with the court's analysis of the two alleged instances of juror misconduct. The spectator's attempt to influence Perez during her testimony was not misconduct by a juror. Nor was it conduct that could influence the jury or prejudice Melonson. The spectator shook her head during the proceedings; she did not speak. This act did not implicate Melonson's guilt or innocence. Moreover, the court instructed the jury on what evidence it could consider in reaching its verdict, evidence which excluded the actions of a spectator in court.

As for the juror reading the Sacramento Bee, the court instructed the jury on its obligation not to read news accounts of the case. The only support for this allegation was the statement of codefendant Weeden. The trial court did not abuse its discretion in declining to release confidential information based on an unsubstantiated claim by Weeden. As the court observed, the request "emanates from the hearsay statement of codefendant Weeden" and "[t]he fact that some jurors may have read the Bee on a date an article about the case appeared" was wholly insufficient to justify unsealing the confidential records. If the allegations of misconduct are vague, speculative, or unsupported, they cannot support good cause for the release of confidential information. (*Wilson*, *supra*, 43 Cal.App.4th at p. 852.)

Nor can we find, as Melonson argues, that the court abused its discretion by curtailing the defense's ability to investigate allegations of serious misconduct.

29

According to Melonson, the trial court abused its discretion in characterizing the defense request as a "fishing expedition." Notwithstanding the court's words, Melonson failed to meet his burden of establishing good cause for the release of the requested confidential juror information. The alleged misconduct was not such that it "is likely to have influenced the verdict improperly," and therefore the court acted well within its discretion in denying the request. (Evid. Code, § 1150, subd. (a).)

**Motion for a Mistrial**

Melonson argues the court erred in denying his motion for a mistrial, which followed Detective Stomsvik's testimony. Detective Stomsvik stated that while interviewing Angela, he confronted her with the "fact that Ryan Moore had confessed." According to Melonson, this testimony both prejudiced him and violated *Aranda-Bruton*.[10] In addition, Melonson contends the trial court's admonition following the testimony was not sufficient.[11]

### *Background*

During the trial, Detective Stomsvik testified about his interview with Angela. He stated she began to provide information about Weeden and Moore. Detective Stomsvik testified, "About halfway into the interview when Detective Joachim confronted her with the fact that Ryan Moore had confessed, things changed."

On cross-examination, Melonson's counsel did not ask Detective Stomsvik about his interview with Angela. Weeden's counsel did question the detective about the interview: "Q[:] Okay. With respect to Ryan Moore's ever evolving confessions, let me ask you some questions with respect to Angela [G.'s] statements.

---

[10] *People v. Aranda* (1965) 63 Cal.2d 518 (*Aranda*); *Bruton v. United States* (1968) 391 U.S. 123 [20 L.Ed.2d 476] (*Bruton*).

[11] Weeden, in her appeal, makes the identical argument.

"First of all, you would agree that one of the tactics of law enforcement when interviewing a witness might be to feed them false information to see what they're going to say; is that true?

"A[:] Are you asking did I do that to Angela [G.], or is that just a plain tactic that could be used by law enforcement?

"Q[:] Make it so clear. Is it a tactic for law enforcement to feed false information to witnesses to see what they will say, yes, it is, no, it is not.

"A[:] It can be, yeah.

"Q[:] In respect to in this case with Angela [G.], at some point you said, hey, Ryan had made a statement about being involved in the robbery, correct"?

"A[:] Correct.

"Q[:] Then she says, I heard Ryan say they should rob the victims, correct?

"A[:] I think she said that, but said, I wasn't sure who said that first, if it was Ryan or Sarah, I think."

Out of the jury's presence, the court discussed Weeden's counsel's objection to Detective Stomsvik's testimony. The court observed that the testimony was not solicited by questioning, but "volunteered by the way of a somewhat nonresponsive answer concerning Detective Joachim indicating to Angela [G.] that Ryan Moore had, quote, confessed, and thereafter Angela [G.'s] statements became more consistent."

Both defendants' counsel moved for a mistrial. Weeden's counsel stated Detective Stomsvik's mention of Moore's confession could lead to the inference that the confession implicated Weeden. Melonson's counsel echoed these fears.

The prosecutor stated Detective Stomsvik's response was unexpected but argued a cautionary instruction would mitigate the harm. When asked by the court whether he would refer to Moore's confession in closing argument, the prosecutor said no.

The court denied the motion, stating: "I did give the jury a limiting instruction that defense counsel had requested. And in part, the admonition given stated thusly, thus

31

the statements by Detective Joachim are not themselves evidence, and the contents of these statements may not be considered by you as evidence against either of the charged defendants. [¶] And the sentence preceding that admonition was as follows, law enforcement officers are permitted to lie to criminal suspects and to pretend that they are in possession of particular facts when they may not be. [¶] I believe out of the entire totality of the circumstances with Detective Stomsvik's testimony this morning, and the fact that Mr. Bowman also clarified that this [is] a typical law enforcement tactic, I think it does not rise to the level of such a due process violation where it has not created such an unfairness in this trial that would warrant a mistrial at this time, and so I would deny the motion for mistrial. [¶] I will certainly reinstruct the jury on this point, counsel, if either one of you want me to do that during the final instructions." Weeden's counsel commented: "Your Honor, I think that would be satisfactory."

### *Discussion*

A mistrial is appropriate only when a party's chances of receiving a fair trial have been irreparably damaged. If the court finds the prejudice is incurable by admonition or instruction, a mistrial should be granted. We review the trial court's ruling on the mistrial motion for an abuse of discretion. (*People v. Avila* (2006) 38 Cal.4th 491, 573.) The statement of a witness during trial can provide the basis for incurable prejudice. (*People v. Wharton* (1991) 53 Cal.3d 522, 565.)

Melonson argues Stomsvik's remark that Moore had confessed was extremely prejudicial. Melonson urges us to consider the devastating impact of Moore's confession given the plethora of evidence of phone calls between Angela, Weeden, and Moore the night of the shooting, coupled with the prosecution's theory at trial that Moore and Melonson were the shooters.

According to Melonson, "Even with an admonition to the jury not to consider Stomsvik's statement for its truth, this was an impossible bell to unring." Melonson also

32

faults the court for failing to tell the jury Stomsvik's statement was not true, thus minimizing the effectiveness of the curative instruction.

We begin by analyzing the sum and substance of Stomsvik's testimony. Stomsvik, while testifying about interviewing Angela about Weeden and Moore's involvement in the crime, stated Angela's testimony changed when another detective "confronted her with the fact that Ryan Moore had confessed." Stomsvik did not elaborate on exactly what Moore confessed to, and did not mention Melonson. The prosecution did not elicit Stomsvik's comment; Stomsvik independently made the observation.

Immediately afterward, Weeden's counsel cross-examined Stomsvik about the police eliciting favorable testimony by lying to suspects. The prosecution, during closing argument, did not refer to Stomsvik's testimony regarding Moore's confession.

In response to Stomsvik's brief mention of Moore's confession, the trial court instructed: "Law enforcement officers are permitted to lie to criminal suspects and witnesses and to pretend that they are in possession of particular facts when they may not be, thus the statements by the various detectives and investigators in that regard are not themselves evidence and may only be considered as they provide context to or clarification of any statements or responses obtained."

Melonson argues this curative instruction does not dispel the prejudice of Stomsvik's testimony, citing *People v. Navarrete* (2010) 181 Cal.App.4th 828 (*Navarrete*). In *Navarrete*, the court suppressed a statement made by the defendant, who was charged with committing a lewd act on a child. During the trial, a detective was asked why swabs taken during the sexual assault examination had not been tested and he replied: " 'Well, for several reasons, the first of which it's a court rule that the defendant's statement is inadmissible. So I can't state the first reason.' " (*Id*. at p. 831.) The court denied a motion for a mistrial, struck the detective's testimony, and instructed the jury to disregard his testimony. (*Id.* at p. 831-832.) Later, the court discovered the

33

detective intentionally violated the court's order suppressing the statement. (*Id.* at p. 833.)

The appellate court reversed, finding the court's curative instructions did not undo the damage inflicted by the detective's testimony because the instruction "did not break the link the jury was likely to perceive between a 'statement' and a 'confession' in the context of other evidence the jury heard." (*Navarrete*, *supra*, 181 Cal.App.4th at p. 834.)

Although Melonson acknowledges the testimony here implicates not his own statement but the statement of a coperpetrator, he argues *Navarrete* applies. Here, Detective Stomsvik inadvertently mentioned Moore's confession; in *Navarrete* the detective referred to a defendant's statement in direct violation of a court order. Unlike the detective in *Navarrete*, Detective Stomsvik briefly mentioned Moore's confession; he did not disclose Moore's words. Nor did the fleeting reference to Moore implicate Melonson in the robbery or murder.

In contrast, the testimony by the detective in *Navarrete* was "neither ambiguous nor inadvertent; it was deliberate, triggered seemingly by his apparent pique at the court's wondering . . . about the detective's credibility." (*Navarrete*, *supra*, 181 Cal.App.4th at p. 836.) The trial court did not abuse its discretion in denying the motion for a mistrial.

WEEDEN'S APPEAL

**Requested Pinpoint Instruction**

Weeden contends the trial court erred in denying her request for an instruction that age is relevant to the mental state required for attempted murder. Weeden argues that prior to a certain stage of maturity, a person does not understand the meaning of robbery, or the element of force and violence in the legal definition of robbery. This lack of an instruction denied Weeden due process.

*Background*

During the discussion of jury instructions, defense counsel requested an instruction "as to Ms. Weeden's age and how the jury could consider the developmental

issues concerning a 14-year-old." The court noted the CALCRIM instructions refer to child witnesses under the age of 10 years and stated it "would not be inclined to give a jury instruction concerning a 14-year-old because it appeared that the demarcation age was ten."[12]

The trial court advised defense counsel it would consider a proposed instruction, and that counsel could point out Weeden's age and immaturity during closing argument. Defense counsel did not submit a proposed pinpoint instruction. However, during closing argument, defense counsel stressed Weeden's age and immaturity in arguing she lacked the intent to commit robbery.

Weeden, in moving for a new trial, argued the court erred in failing to instruct on age as related to specific intent.[13] The court disagreed, noting: "Both then and now defense counsel has failed to provide any authority for this position. In fact, no sua sponte or other duty exists in law for this request. It is the Court's recollection that

---

[12] CALCRIM No. 330 states: "You have heard testimony from a child who is age 10 or younger. As with any other witness, you must decide whether the child gave truthful and accurate testimony. [¶] In evaluating the child's testimony, you should consider all of the factors surrounding that testimony, including the child's age and level of cognitive development. [¶] When you evaluate the child's cognitive development, consider the child's ability to perceive, understand, remember, and communicate. [¶] While a child and an adult witness may behave differently, that difference does not mean that one is any more or less believable than the other. You should not discount or distrust the testimony of a witness just because he or she is a child."

[13] The motion for a new trial cited Penal Code section 26, and a civil jury instruction, CACI No. 402. Section 26 states, in pertinent part: "All persons are capable of committing crimes except those belonging to the following classes: [¶] One--Children under the age of 14, in the absence of clear proof that at the time of committing the act charged against them, they knew its wrongfulness." CACI No. 402 states: "[Defendant] is a child who was [ ] years old at the time of the incident. Children are not held to the same standards of behavior as adults. A child is required to use the amount of care that a reasonably careful child of the same age, intelligence, knowledge, and experience would use in that same situation."

35

[defense counsel] used the defendant's age and evidence of good character, as testified to by family and close friends, to argue that the jury find her not guilty."

### *Discussion*

The trial court must instruct on general principles of law closely connected to the facts and necessary for the jury's understanding of the case. (*People v. Avila* (2006) 38 Cal.4th 491, 567-568.) In addition, defendant is entitled to instructions that pinpoint the defense theory, if requested, when supported by substantial evidence. (*People v. Crew* (2003) 31 Cal.4th 822, 836.)

Here, the trial court instructed with CALCRIM Nos. 252, specific intent; 401, aiding and abetting; 540B, felony murder; and 1600, robbery. On appeal, we presume jurors are capable of understanding and correlating jury instructions. (*People v. Brock* (2006) 143 Cal.App.4th 1266, 1277.)

Weeden, citing *People v. Mendoza* (1998) 18 Cal.4th 1114 (*Mendoza*), argues a defendant's age is relevant to the element of shared criminal intent. In *Mendoza*, the Supreme Court stated: "Unlike the act of the direct perpetrator, the act of the aider and abettor is not inherently criminal. Indeed, the aider and abettor's act may be, and often is, innocuous when divorced from the culpable mental state. (To the extent the act is itself inherently criminal, it may subject the person to criminal liability as a direct perpetrator.) For example, the act of handing a baseball bat to another person is not itself criminal. Baseball players, friends, and parents do it routinely. That act, not being criminal by itself, cannot be made either more or less criminal by the circumstance that the person is intoxicated. However, if the person committing that act *knows* that the other person will hit a third person over the head with a bat, and *intends* to facilitate that further act, the person can be criminally liable as an aider and abettor for that further act and for any other crime actually committed that is a reasonably foreseeable consequence of the intended crime. The act of hitting someone on the head with a bat *is* inherently criminal and as [*People v.*] *Hood* [(1969) 1 Cal.3d 444] and section 22 teach, is not less criminal

36

because the hitter is intoxicated. But the alleged aider and abettor is liable for that inherently criminal act only if the necessary mental states of knowledge and intent exist. To say that the act of the aider and abettor should not be less criminal because of intoxication is meaningless until one determines that the alleged aider and abettor is liable for some criminal act." (*Mendoza*, at p. 1129.)

Weeden likens her youth and immaturity to the intoxication discussed in *Mendoza*, arguing she lacked the judgment and foresight necessary to form the necessary intent to aid and abet Melonson and Moore in their violent robbery of the victims. In essence, Weeden argues, even though there was circumstantial evidence regarding her immaturity, the jury lacked any instruction on how to evaluate this information.

Weeden also points to CALCRIM No. 334, which states, in relevant part: "You may not conclude that a child under 14 years old was an accomplice unless you also decide that when the child acted, (he/she) understood: [¶] 1. The nature and effect of the criminal conduct; [¶] 2. That the conduct was wrongful and forbidden; [¶] AND [¶] 3. That (he/she) could be punished for participating in the conduct." According to Weeden, the factors set forth in the instruction are equally applicable to a person just over the age of 14.

We disagree with Weeden's evaluation of the jury and the evidence before it. Several witnesses testified in Weeden's defense, stressing her lack of maturity and sheltered upbringing. The witnesses stated Weeden was not capable of setting up a robbery because of her caring, bashful nature.

In addition, defense counsel vigorously argued that because of her age, Weeden was incapable of planning a robbery and was susceptible to manipulation by others. Counsel urged the jury "to put glasses on of a 14-year-old girl." Counsel continued: "It's . . . easy as a 40-something individual looking back at life, knowing what's up, who to trust, fairly street smart, can smell a rat a mile away perhaps than [*sic*] a 14-year-old girl. It's just different. [¶] . . . [¶] You're easily manipulated. That's why as a society,

37

we don't even let them decide who they can have sex with because they're too easily manipulated. They can't make their own decisions whether they can drink or smoke because they're not smart enough, because they're too easily manipulated to decide who they can have sex with. [¶] But the Prosecution wants to charge her as an adult, under adult standards. But you can take into consideration, put on those glasses of a 14-year-old and tee, hee, hee, older boys want to talk to me and what should I do and let's send 'em on a wild good [*sic*] chase. [¶] That's a 14-year-old girl, it just is, and you get to put those glasses on. And it's [*sic*] easily manipulated by older people when she stepped into this mess of vipers. [¶] And blaming her for this is like blaming a child molest victim. She's 14. She don't [*sic*] know what she's doing."[14]

Defense counsel, through witness testimony and argument, asked the jury to consider Weeden's age in determining whether she was guilty of the crimes. Contrary to Weeden's assertion, the jury was not left with the impression that her age was not relevant, regardless of the court's refusal to expressly instruct on the issue.

**Ineffective Assistance**

### *Failure to Introduce Psychological Testimony*

Weeden contends trial counsel performed ineffectively in failing to present psychological testimony to determine the extent of her emotional and cognitive development. According to Weeden, such testimony would have raised doubts as to whether she was capable of forming the intent to rob.

#### **Background**

Weeden moved for a new trial, arguing ineffective assistance based on trial counsel's failure to introduce psychological testimony. In conjunction with the motion, appellate defense counsel included a psychological evaluation by Lisa Boal Perrine,

---

[14] Defense counsel also pointed out that although Weeden as she sat before the jury at trial was 17, she was only 14 at the time of the crimes.

Ph.D. Dr. Perrine interviewed Weeden twice following the verdict and conducted standardized psychological tests.

Dr. Perrine concluded that although Weeden could comprehend the concept of robbery, "it is extremely unlikely she would intend to commit robbery or knowingly participate in one." According to Dr. Perrine, Weeden would probably be slow to understand that others were contemplating robbery if their intentions were not clearly articulated.

At the hearing on the new trial motion, trial counsel testified. When asked about having Weeden examined by a psychologist, trial counsel responded: "I had contemplated it, and it was my opinion that it wouldn't necessarily have been helpful. [¶] My opinion was regardless of what the doctor would have concluded, it would be inconsistent with the defense that I was putting forth."

Trial counsel admitted he did not know what conclusion a psychologist would reach, "[b]ut -- for instance, if the doctor were to conclude that she was completely immature for instance and . . . easily manipulated, my concern would have been that the Prosecution would have used that to show that she didn't understand perhaps the magnitude of a robbery, but still participated in it. [¶] So I had some concerns that that could be twisted and turned against her."

Dr. Perrine testified that Weeden was unable to comprehend the concept of robbery or to understand that someone was contemplating a robbery. Given Weeden's personality and behavioral history, it was extremely unlikely she would intend to commit or knowingly participate in a robbery. Dr. Perrine also found Weeden to be a passive follower, unlikely to take the initiative.

The court denied the motion, reasoning: "Based on the defendant's own declaration, she acknowledges that Ryan Moore said he wanted to rob the victim and wanted her to set up a meeting, but she did not agree to the plan. She also denies that she set up the robbery plan. Six days later she followed the advice of others to arrange to

39

meet the victim, but not show up, so he would stop calling her. She did not think Ryan Moore would follow through with the robbery plan because no one had mentioned it since the initial discussion some six days before. Thus her intent does not appear to be at issue since she denies that she planned the robbery or agreed to it or had any conversation about it when she set the victim up." The court found trial counsel's considered decision "to have been a sound tactical decision and furthermore it does not appear to have been prejudicial in any event."

### Discussion

To establish ineffective assistance of counsel, a defendant must show counsel's performance was deficient and fell below an objective standard of reasonableness, and it is reasonably probable that a more favorable result would have been reached absent the deficient performance. (*Strickland v. Washington* (1984) 466 U.S. 668, 687-688 [80 L.Ed.2d 674] (*Strickland*).) A reasonable probability is a "probability sufficient to undermine confidence in the outcome." (*Id.* at p. 694.)

Weeden contends trial counsel's decision not to have her examined by a psychologist was not a sound tactical decision. However, trial counsel articulated a very reasonable tactical decision for not requesting such an examination. If the examination revealed Weeden was easily manipulated, the prosecution could claim this was evidence that although Weeden did not understand the magnitude of the robbery, she nonetheless went along with it. In essence, the examination might undermine the defense strategy trial counsel was pursuing at trial.

In addition, Weeden argues the lack of psychological testimony on her lack of specific intent "undermines confidence in the outcome of this trial." According to Weeden, the testimony of Dr. Perrine would have raised a reasonable doubt as to whether Weeden harbored a specific intent to rob. Presented with Dr. Perrine's testimony, the jury would not have concluded Weeden joined in Melonson's criminal intent to commit armed robbery.

Again, trial counsel pursued the defense that Weeden did not set up the robbery or agree to it. The testimony Weeden claims counsel was ineffective in failing to present might well have undermined this defense. Among Dr. Perrine's findings was that Weeden had a strong tendency to be a passive follower, which might have led the jury to conclude she did not initiate the robbery but, sheep-like, went along with it. We find no ineffective assistance.

**Removal of Juror for Bias**

According to Weeden, jurors who were intent on conviction complained to the court about Juror No. 11's declaration that he would not convict a child of murder. Since age was a proper consideration in evaluating Weeden's intent, Weeden argues Juror No. 11 did not commit misconduct by considering it.

*Background*

During deliberations, the jurors sent the trial court a note stating information about the Melonson verdict had been divulged, although not all jurors were privy to the information. The trial court questioned the jury foreperson about the issue. The foreperson explained that Juror No. 4 read an article on the codefendant's verdict and mentioned it to Juror No. 11. No other jurors participated in the conversation. The foreperson stated she would decide the case on its merits, putting aside anything Juror No. 4 said about the article.

Juror No. 4 acknowledged reading the article about Melonson and discussing it with Juror No. 11. Juror No. 11 stated that Juror No. 4 told him about the Melonson verdict in order to bully him into changing his opinion. Juror No. 11 believed he could continue to deliberate and be fair to both sides but acknowledged he could not set the information aside, although he would try not to let it affect him.

The court dismissed Juror No. 4 for misconduct. The prosecution asked that Juror No. 11 also be dismissed. Although the court denied the request, it noted Juror No. 11 "is now aware that the Melonson jury has convicted him of the attempted robbery counts,

41

and I can certainly see from the Defense perspective that having that information is not helpful." The court offered to excuse Juror No. 11 if requested by the defense. The defense declined the offer.

After Juror No. 4 was replaced, deliberations continued. Subsequently, the jury sent the court a note stating: "Some statements were made by 1 juror that he could not convict a child. Those statements have been weighing heavily on the majority. He also is very sympathetic to the outcome of a particular conclusion & what will happen to the defendant. No notes were taken however he did write 'Jesus loves you.' When aske[d] to recall what his notes said he stated he had none & then grabbed another juror[']s notepad. Today he even went as far as saying to note [*sic*] & he would go along w/the majority just to go home. Then he backed [*sic*] tracked & disagreed. He is too hung up on the age of defendant."

After receiving the note, the court questioned Jurors Nos. 2, 3, 5, 8, and 12 about the note. Juror No. 8 stated that, on the first day of deliberations, Juror No. 11 stated he "cannot convict a child, he cannot sleep at night, he cannot hold that in his heart." Juror No. 8 also stated: "[I]t's affecting us because we know that, the reasoning isn't there for whatever decisions are being brought to the table." Jurors Nos. 2, 3, 5, and 12 heard Juror No. 11 say he could not convict a child. Although his fellow jurors asked him to explain his opinion, Juror No. 11 failed to provide any explanation.

The jurors reminded one another that they were to deliberate free of bias and prejudice. Juror No. 2 stated that someone asked Juror No. 11 if he was biased, "And at first he didn't answer. He just asked back. [¶] Are you biased? [¶] And they said no. [¶] And then he said well, I am. [¶] And that was just yesterday."

During deliberations, Juror No. 11 expressed concern about possible punishment, stating, "[T]his is a capital murder case." Juror No. 11 was very worried about someone convicted of murder being sentenced to life in prison. He discussed punishment for five

42

days and was the only juror who repeatedly brought up the issue. Juror No. 11 refused to listen to the other jurors' advice to not consider punishment.

Juror No. 11 said he did not need to review his notes because he remembered everything. However, Juror No. 11 took Juror No. 3's notes to refresh his memory. Juror No. 3 stated that Juror No. 11 asked, "[W]hat did you write down?" and Juror No. 3 allowed him to see his notebook. Juror No. 11 had written "Jesus Loves You" in his notebook and drawn a "happy face."

The day before the hearing, Juror No. 11 told the others he would go along with them just to go home. However, his fellow jurors said he could not do that. Juror No. 11 began discussing Weeden's age, expressing concern about her youth. He refused to give any facts supporting his statements.

During the hearing, the trial court said to Juror No. 11, "It's indicated that you've made comments that you cannot convict a child."

"[Juror No. 11:] No, that's not true.

"[Court:] You did not say that[?]

"[Juror No. 11:] No, I did not.

"[Court:] It's also been indicated to me that you are very sympathetic to the outcome of a particular conclusion and what will happen to the defendant. [¶] Have you voiced those types of concerns to the jury?

"[Juror No. 11:] We've talked about the law and what felony murder is.

"[Court:] Have you discussed the punishment?

"[Juror No. 11:] No.

"[Court:] No discussions about the punishment.

"[Juror No. 11:] No.

"[Court:] Okay. It's also been indicated to me that at some point . . . you did not take notes evidently during the trial, but had written down in your notebook 'Jesus Loves You'.

43

"[Juror No. 11:] Yes.

"[Court:] Is that true?

"[Juror No. 11:] Yes, it is true, your Honor.

"[Court:] Okay. And when you were asked to recall what your notes said, that you stated that you had none, and then you grabbed another juror's notepad.

"[Juror No. 11:] No. That's a lie.

"[Court:] That's a lie. [¶] It's indicated to me that at some point in time yesterday, that you said you would vote a certain way just to go along with the majority, but then you backtracked and disagreed.

"[Juror No. 11:] Yes."

Following this colloquy, the trial court observed that someone was not telling the truth, "and it is my observation, based on the demeanor, the specifics, the nature of the allegations, that I'm of the view that Juror [No. 11] is untruthful." In addition, the court found Juror No. 11 engaged in repeated instances of misconduct and exhibited bias in favor of Weeden based on her age.

The court found the other jurors "extremely credible" and did not believe Juror No. 11's denials. Juror No. 11, the court believed, was incapable of following the court's instructions, particularly those related to penalty and punishment. The court determined Juror No. 11 "should be removed from this jury for repeated instances of misconduct and failure to follow the Court's instructions, and I would make the further finding that he is biased."

In response, defense counsel requested that the court interview the remaining jurors in an effort to confirm Juror No. 11's version of events. Following a recess to allow the court to research the issue, the court denied the request, finding it an unnecessary intrusion on the deliberative process.

The court found the jurors interviewed to be especially credible. As to defense counsel's concerns that Juror No. 11 had been bullied, the court found the jurors who

44

came forward did not do so gleefully or with any motive other than a desire to deliberate as instructed. The jurors were very concerned that, despite their best efforts, Juror No. 11 was unable to set aside his biases and decide the case on the facts. The court found no bullying of Juror No. 11; instead, the other jurors asked Juror No. 11 to cite specific facts, which he was unable to do. When Juror No. 11 offered to vote with the others, the jurors dissuaded him from such inappropriate behavior. The court concluded these facts undermined and contradicted any claim of bullying during deliberations.

The court found Juror No. 11 lied to the court and willfully disregarded the court's instructions. Since Juror No. 11 was unable to perform his duties within the meaning of section 1089, the court removed the juror and replaced him with an alternate.

In her motion for a new trial, Weeden argued Juror No. 11's removal was improper. Weeden submitted a declaration from a private defense investigator stating: "I spoke with juror [name redacted]. He informed me that juror [No. 11] had engaged in deliberations and had not refused to deliberate. . . . I contacted him again and asked for his signature on a declaration. He declined to sign a declaration and stated that he wanted to put the whole matter behind him." The court denied the motion.

### *Discussion*

Under section 1089, "If at any time, whether before or after the final submission of the case to the jury, a juror . . . upon other good cause shown to the court is found to be unable to perform his or her duty . . . the court may order the juror to be discharged and draw the name of an alternate . . . ." A juror who is biased is unable to perform the duty to deliberate fairly and is subject to discharge. Bias may be established by the testimony of other jurors. (*People v. Barnwell* (2007) 41 Cal.4th 1038, 1051 (*Barnwell*).)

We uphold the trial court's determination if the decision is supported by substantial evidence and the juror's inability to perform appears in the record as a demonstrable reality. The demonstrable reality standard requires a stronger showing than mere substantial evidence. This test requires a showing that the trial court relied on

45

evidence that, in light of the entire record, supports the court's conclusion that disqualification was established.  This standard protects a defendant's fundamental right to due process and an unbiased jury.  (*People v. Wilson* (2008) 44 Cal.4th 758, 821; *People v. Watson* (2008) 43 Cal.4th 652, 696 (*Watson*).)

"The evidence bearing on the question whether a juror has exhibited a disqualifying bias during deliberations may be in conflict.  Often, the identified juror will deny it and other jurors will testify to examples of how he or she has revealed it.  [Citation.]  In such a case the trial court must weigh the credibility of those whose testimony it receives, taking into account the nuances attendant upon live testimony.  The trial court may also draw upon the observations it has made of the jurors during voir dire and the trial itself.  Naturally, in such circumstances, we afford deference to the trial court's factual determinations, based, as they are, on firsthand observations unavailable to us on appeal."  (*Barnwell*, *supra*, 41 Cal.4th at p. 1053.)

Weeden contends the trial court abused its discretion by not examining the full jury before dismissing Juror No. 11.  Instead, Weeden argues, the court merely examined the complaining jurors and Juror No. 11, "effectively stack[ing] the deck against the holdout juror."  The remaining jurors, according to Weeden, "were the best source of an unbiased account of any alleged misconduct."  This limited examination of jurors prejudiced Weeden.

Here, the trial court was well aware of these concerns in limiting the scope of juror inquiry.  The court determined that questioning the entire jury would unnecessarily intrude on the jury's deliberation process.  After defense counsel requested that all the jurors be questioned, the court stated the five jurors questioned were "especially credible on these issues."  Nor did the court find any evidence of bullying by the complaining jurors.

The court also acknowledged that one juror stated in a declaration that Juror No. 11 had not refused to deliberate.  The court noted that the declaration stated "the five

46

jurors who signed the note were combative and trying to beat the discharged juror down."
However, the declaration also "supports some of the same assertions made by the five
jurors including the following: [¶] The discharged juror did state that he could not send
such a young girl to prison for this crime and that quote, he did what he felt he had to
because of his religious faith, end of quote."

The court noted the juror declined to sign the declaration. The court termed the
declaration hearsay, noting "it is vague and conclusory and provides no pertinent
information."

Given the facts before it, the trial court did not abuse its discretion in declining to
widen its inquiry to include all jurors. We note that courts "should use caution when
making inquiries because of the need to protect the sanctity and secrecy of jury
deliberations." (*People v. Bennett* (2009) 45 Cal.4th 577, 624 (*Bennett*).) Here the court
exercised such caution.

Weeden contends Juror No. 11's concern over her age was a relevant
consideration and not an indicator of bias. Juror No. 11, Weeden argues, was merely
basing his opinion on past life experiences, which is not a cause for disqualification.

Weeden glosses over the evidence. Fellow jurors reported that Juror No. 11 began
deliberations by stating he could not convict a child. He refused to participate in
deliberations based on this belief. However, when questioned by the court, Juror No. 11
denied stating he could not convict a child.

Faced with this conflict, the trial court concluded: "I believe that a reviewing
court will find that the juror was not discharged for refusing to deliberate. Instead, the
juror was removed for repeated instances of misconduct involving the inappropriate
consideration of age -- specifically that he could not vote to convict a child and the
inappropriate consideration of penalty and punishment as well as for dishonesty during
the Court's investigation of the misconduct claim. The investigation that was conducted
clearly showed a willful disregard of the Court's instructions. Additionally, at the time, I

47

made findings about the credibility, demeanor and manner of the jurors who were questioned on this issue and I incorporate by reference those findings."

Contrary to Weeden's analysis, Juror No. 11 was not merely bringing personal experience to the deliberations. Juror No. 11 told fellow jurors he could not convict a child, then denied such statements when questioned by the court. It is axiomatic that the trial court is in the best position to observe and evaluate a juror's words and demeanor. (*People v. Schmeck* (2005) 37 Cal.4th 240, 298.) Here, the court found Juror No. 11 not to be truthful in his denials. Based on the entire record, we find the court's determination meets the demonstrable reality standard. (*Watson*, *supra*, 43 Cal.4th at p. 696.)

Weeden asserts Juror No. 11's concern over punishment was only another way of stating the juror's consideration of age as related to the mental element of attempted robbery. According to Weeden, such concerns do not amount to misconduct.

Fellow jurors reported that Juror No. 11 discussed penalty and punishment during deliberations despite the court's admonition not to do so. When questioned by the court, Juror No. 11 denied any such comments. The court heard and observed Juror No. 11's statements and found them untruthful. Again, the court was in the best position to assess Juror No. 11's credibility.

Finally, Weeden contends "perceived lying" by a juror is not a sufficient reason to excuse the juror. Weeden faults the court for finding Juror No. 11 not trustworthy without examining all the jurors.

As discussed, *ante*, we cannot fault the court for declining to interview the entire jury. Nor can we substitute our judgment for the court's ability to discern Juror No. 11's veracity. We also reject Weeden's suggestion that the trial court erroneously considered "perceived lying" in excusing the juror. The cases relied on by Weeden stand for the unremarkable propositions that, standing alone, unintentional concealment of material information by a prospective juror during voir dire will not warrant the juror's later removal during jury deliberations, and a false statement by a juror during deliberations,

48

absent evidence of prejudice, is not grounds for a new trial. They bear no similarity to the present dispute. The court's dismissal of Juror No. 11 is supported under both the substantial evidence standard and the demonstrable reality standard.

**Deprivation of Right to Testify**

Weeden contends the court erred in denying her motion for a new trial because she was denied the right to testify due to her age and lack of maturity. Weeden argues she was the best witness to her intent at the time of the offense, and defense counsel deprived her of her constitutional right in advising her not to testify.

*Background*

Weeden requested a new trial based on defense counsel's ineffective performance in dissuading her from testifying. The motion was supported by a declaration by trial counsel. Trial counsel stated he advised Weeden not to testify based on her lack of maturity. Weeden failed to give meaningful responses to questions, answering " 'I don't know' " inappropriately. Trial counsel believed Weeden's immaturity and shyness caused her ineffectiveness, but was concerned the jury would not understand this. The trial court denied the motion.

The court found defense counsel's explanation of why he did not advise Weeden to testify "absolutely sound trial strategy." Weeden did not claim defense counsel told her that she could not testify, and the trial court obtained a waiver from Weeden of her right to testify during trial. The trial court said to Weeden: "It doesn't matter what [defense counsel] says. He might tell you it's a bad idea, but ultimately it is your decision and your decision alone to decide whether or not to testify. Do you understand that?" Weeden responded: "Yes." She also affirmed it was her decision not to testify. The court concluded Weeden "was fully engaged and competent to make that intelligent and knowing waiver."

Nor did the court find Weeden's age and immaturity rendered her incompetent to testify: "To the extent that defendant confuses her right to testify with a right to present a

49

believable and credible version of events, this Court is unaware and the Defense cites no authority for this novel and expansive view. To the extent that this argument invites the Court to suspend proceedings I decline to do so because I find absolutely no evidence, substantial or otherwise that would require this action. At all times Miss Weeden has appeared to this Court to be fully competent and engaged in the trial proceedings."

### *Discussion*

In ruling on a new trial motion, the trial court possesses broad discretion, and there is a strong presumption that it properly exercised its discretion. We will not reverse the trial court's exercise of that discretion absent a manifest and unmistakable abuse of that discretion. (*People v. Williams* (1988) 45 Cal.3d 1268, 1318.)

In her motion for a new trial, Weeden argued trial counsel performed ineffectively in advising her not to testify. In addition, Weeden argued she was incompetent and incapable of testifying effectively on her own behalf.

As to the first claim, ineffective assistance, the trial court found trial counsel's decision "sound trial strategy." We agree.

Trial counsel explained he met with Weeden to discuss her testimony. He went over her potential testimony "many times" but determined Weeden would make a poor witness due to her immaturity and shyness. Given these discussions, trial counsel advised Weeden not to testify at trial. Weeden followed counsel's advice and elected not to testify. Trial counsel's decision to dissuade Weeden from testifying was not deficient when measured against the standard of a reasonably competent attorney. (*Strickland*, *supra*, 466 U.S. at pp. 687-689.)

As to the second claim, that Weeden's immaturity made her incompetent to testify, the court found Weeden at all times appeared to be "fully competent and engaged in the trial proceedings." Although trial counsel described Weeden as "a little girl in every since [*sic*] of the word" and lacking in maturity and sophistication, we cannot second-

50

guess the trial court, who was in the best position to observe and evaluate Weeden's competence.

Moreover, Weeden's academic performance did not reflect any mental defect impinging on her ability to testify. Her grades were improving, she performed well on tests in preparation for her GED (general educational development) test, and one teacher described her as self-motivated and responsible.

The court, in denying the motion for a new trial, found Weeden "a little bit more manipulative and a little bit more sophisticated than those that know her the best and love her the most will accord." Based on this record we cannot find the court erred in rejecting Weeden's claim that she was incompetent to testify.

**Instruction on Aiding and Abetting**

Weeden objects to the trial court's instructing pursuant to CALCRIM No. 400 that she is "equally guilty" of the crime committed by the perpetrator. The instruction, Weeden argues, is misleading because it does not allow for a lesser degree of guilt on the part of the aider and abettor. Since the perpetrators, Moore and Melonson, had the intent to commit robbery, an intent not shared by Weeden, the instruction was in error.

CALCRIM No. 400 states: "A person may be guilty of a crime in two ways. One, he or she may have directly committed the crime. I will call that person the perpetrator. Two, he or she may have aided and abetted a perpetrator, who directly committed the crime. A person is equally guilty of the crime whether he or she committed it personally or aided and abetted the perpetrator who committed it." Defense counsel did not object to the instruction.

*Discussion*

Weeden faults the instruction on aiding and abetting for failing to allow for a lesser degree of guilt on the part of the aider and abettor. She argues that although the perpetrators, Moore and Melonson, intended to rob the victims, she did not share this

51

intent. In support, Weeden relies on *People v. Samaniego* (2009) 172 Cal.App.4th 1148 (*Samaniego*).)

In *Samaniego*, the appellate court held the criminal liability of the aider and abettor may be less than that of the perpetrator, if the aider and abettor has a less culpable mental state. (*Samaniego*, *supra*, 172 Cal.App.4th at pp. 1164-1165.) Therefore, the language of CALCRIM No. 400, which instructs that the aider and abettor is equally guilty with the perpetrator, may be misleading. (*Samaniego*, at pp. 1164-1165.) The court found the error harmless, since the issue of shared intent was resolved against the defendant by other instructions. The court instructed pursuant to CALCRIM No. 702, which requires the aider and abettor share the perpetrator's intent to kill. (*Samaniego*, at pp. 1165-1166.)

Weeden argues that once the jury determined Moore and Melonson intended to commit a robbery, the jury should have determined whether she shared that intent. The instructions, Weeden claims, failed to inform the jury of the necessity for that determination.

We disagree. In *Samaniego* the jury considered aiding and abetting, but not in the context of felony murder. Here, the court instructed that Weeden was guilty of murder under the felony murder theory if she aided and abetted an attempted robbery; she intended to aid and abet the perpetrator in committing a robbery; if she did not personally attempt to commit robbery, then a perpetrator whom Weeden was aiding and abetting personally attempted to commit robbery; and while attempting to commit robbery, the perpetrator did an act that caused the death of another person. (CALCRIM Nos. 401, 540B.)

The court explicitly instructed the jury that it must find Weeden intended to aid and abet the robbery. Although the court also instructed pursuant to CALCRIM No. 400, it is not plausible that the jury would ignore the explicit instruction on the need to find intent and, instead, impute a finding of intent to Weeden.

52

**Jurisdiction**

According to Weeden, the trial court lacked jurisdiction because the complaint originally filed alleged a special circumstance under section 190.2, which is inapplicable to her as a 14 year old. Weeden also challenges the prosecution's exercise of discretion in deciding to file directly in the superior court. In her motion for a new trial, Weeden argued the trial court lacked jurisdiction.

*Background*

The trial court found the prosecution properly exercised its discretion, and therefore the court had jurisdiction over Weeden. The complaint, the court found, alleged the special circumstance under Penal Code section 190.2, subdivision (a) but also alleged jurisdiction under Welfare and Institutions Code section 707, subdivision (d)(2)(A), which gives the district attorney the discretion to file the case in criminal court. The court rejected Weeden's argument that because the district attorney originally alleged the special circumstance, this precluded any exercise of discretion under section 707. The court found no authority to support Weeden's assertion that the district attorney is precluded "from alleging alternative ways -- even if one is mandatory and the other is discretionary -- for a case to be brought in criminal court."

Weeden also argued the district attorney's policy of filing all murder cases in criminal court amounted to no exercise of discretion in individual cases, invading the legislative function of defining crime and punishment. The court rejected the claim, finding: "First, the Defense has not shown that the District Attorney has not exercised her discretion. As the Defense points out the District Attorney's policy does allow for exceptions to the policy. [¶] It states quote, the Chief Deputy or Assistant District Attorney must approve any exception to the policy . . . . [¶] Second, it is not this Court's job to oversee -- absent evidence of discrimination and arbitrariness -- whether the District Attorney has adequately exercised her discretion."

53

In addition, the court noted that in *Manduley v. Superior Court* (2002) 27 Cal.4th 537 (*Manduley*), the Supreme Court held that Welfare and Institutions Code section 707, subdivision (d) grants the district attorney authority to establish guidelines for filing pleadings in criminal court. The court also rejected Weeden's claim that the district attorney's failure to exercise discretion to file in juvenile court violated due process.

### *Discussion*

Weeden argues the trial court lacked jurisdiction over her because the original complaint alleged a special circumstance under Penal Code section 190.2, which is inapplicable to her as a 14 year old. However, as the trial court found, the complaint also alleged that the court had jurisdiction under Welfare and Institutions Code section 707, subdivision (d)(2)(A).

Welfare and Institutions Code section 707, subdivision (d) provides, in pertinent part: "(2) Except as provided in subdivision (b) of Section 602, the district attorney or other appropriate prosecuting officer may file an accusatory pleading against a minor 14 years of age or older in a court of criminal jurisdiction in any case in which any one or more of the following circumstances apply: [¶] (A) The minor is alleged to have committed an offense which if committed by an adult would be punishable by death or imprisonment in the state prison for life." The prosecution's decision to file charges against a minor in criminal court under section 707 "is well within the established charging authority of the executive branch." (*Manduley*, *supra*, 27 Cal.4th at p. 545.)

Weeden provides no authority for her contention that the inclusion of the inapplicable special circumstance under Penal Code section 190.2 trumps the allegation under Welfare and Institutions Code section 707, subdivision (d), which is clearly within the district attorney's discretion. Nor do we find the district attorney abused that discretion in charging Weeden under section 707, subdivision (d). As the court noted, the district attorney's charging policy allows for exceptions.

Here, Weeden was charged with felony murder, a murder in connection with a bungled robbery. This offense subjected Weeden to the possibility of life in prison if she had been an adult at the time of the crimes. (§ 190.2, subd. (17)(a).) Therefore, the district attorney had the discretion to charge Weeden as an adult.

**Cruel and Unusual Punishment**

Weeden argues her sentence of 29 years to life constitutes cruel and unusual punishment within the meaning of the state and federal Constitutions. In support, Weeden stresses her youth, lack of prior record, her immaturity, the fact that liability was based on the felony murder rule, and the fact that she had little knowledge of the circumstances surrounding the murder. According to Weeden, the felony murder rule does not serve its intended function when applied to juveniles, who are incapable of assessing the danger of felonious conduct to human life.

A sentence violates the California Constitution's prohibition against cruel and unusual punishment if "it is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity." (*In re Lynch* (1972) 8 Cal.3d 410, 424.) To make this determination, we may consider (1) the nature of the offense and the offender, with particular regard to the degree of danger both present to society; (2) comparison of the challenged penalty to punishment prescribed in California for more serious offenses; and (3) comparison of the challenged penalty to punishment prescribed in other jurisdictions for the same offense. (*Id*. at pp. 425-428.)

In a spate of recent state and federal cases, courts have tackled the troubling question of juvenile offenders and lengthy sentences. The United States Supreme Court in *Graham v. Florida* (2010) ___ U.S. ___ [130 S.Ct. 2011, 176 L.Ed.2d 825] (*Graham*) held the sentence of life in prison without parole cannot be imposed upon a juvenile defendant for a nonhomicide offense. In *Miller v. Alabama* (2012) ___ U.S. ___ [132 S.Ct. 2455, 183 L.Ed.2d 407] (*Miller*), the United States Supreme Court found the

Eighth Amendment prohibits imposing the term of life in prison without the possibility of parole for juvenile defendants convicted of homicide. (*Miller*, at p. 2465.)

More recently, in *People v. Caballero* (2012) 55 Cal.4th 262 (*Caballero*), the California Supreme Court considered both *Graham* and *Miller* in determining whether a juvenile's sentence violated the Eighth Amendment to the United States Constitution. The 16-year-old defendant in *Caballero* was sentenced to 110 years to life for three counts of attempted murder. The defendant was a diagnosed schizophrenic. (*Caballero*, at p. 265.)

The *Caballero* court observed that in *Graham*, the court held the Eighth Amendment requires the state to afford juvenile offenders a meaningful opportunity to obtain release based on demonstrated growth and maturity. The *Graham* court relied on studies showing fundamental differences between juvenile and adult minds, including behavior control, which continues to mature through late adolescence. The court also noted studies that show juveniles are more capable of change than adults. (*Caballero*, *supra*, 55 Cal.4th at p. 266.) As the *Caballero* court observed, "*Graham* likened a life without parole sentence for nonhomicide offenders to the death penalty itself, given their youth and the prospect that, as the years progress, juveniles can reform their deficiencies and become contributing members of society." (*Ibid*.)

*Caballero* also noted that *Miller* reiterated *Graham*'s focus on the "distinctive (and transitory) mental traits and vulnerabilities" of children, finding them applicable even in a robbery turned homicide. (*Caballero*, *supra*, 55 Cal.4th at p. 267.) The court in *Caballero* found that *Miller* further clarified *Graham*'s " 'flat ban' " on life-without-parole sentences applied to all nonhomicide cases involving juvenile defendants, including the term-of-years sentence that amounts to the functional equivalent of a life-without-parole sentence imposed in *Caballero*. (*Id*. at pp. 267-268.)

Based on its analysis of *Miller* and *Graham*, the court in *Caballero* held that sentencing a juvenile offender for a nonhomicide offense to a term of years with a parole

eligibility date that falls outside the offender's natural life expectancy constitutes cruel and unusual punishment. Although the proper authorities may determine a juvenile offender should remain incarcerated for his or her lifetime, the state cannot deprive the juvenile at sentencing of a meaningful opportunity to demonstrate rehabilitation. (*Caballero*, *supra*, 55 Cal.4th at p. 268.) The court declined to provide precise time frames for setting further parole hearings in a nonhomicide case, noting each case would be based on different facts. The sentence must, to avoid violating the Eighth Amendment, provide the offender with "a 'meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation.' " (*Caballero*, at p. 269.) Accordingly, the court reversed and remanded the case.

Here, we consider a 14-year-old defendant convicted of first degree murder and attempted second degree robbery, and sentenced to 25 years to life plus four years. Although *Caballero* did not consider a juvenile convicted of murder, the court did discuss the possibility of a murder sentence violating the Eighth Amendment: "Although *Miller* concluded that *Graham*'s categorical ban on life without parole sentences applies only to all nonhomicide offenses, the court emphasized that in homicide cases, states are forbidden from imposing a '[m]andatory life without parole for a juvenile.' [Citation.] The high court noted that such mandatory sentences preclude consideration of juveniles' chronological age and its hallmark features—among them, immaturity, impetuosity, and failure to appreciate risks and consequences. It prevents taking into account the family and home environment that surround them—no matter how brutal or dysfunctional. [Citation.] Thus, in *Miller* the high court did 'not foreclose a sentencer's ability' to determine whether it was dealing with homicide cases and the ' "rare juvenile offender whose crime reflects irreparable corruption." ' [Citations.] The court requires sentencers in homicide cases 'to take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison.'

[Citation.] We leave *Miller*'s application in the homicide context to a case that poses the issue." (*Caballero*, *supra*, 55 Cal.4th at p. 268, fn. 4.)

The punishment imposed here was not grossly disproportionate to the crime. A young man lost his life due to the actions of Weeden and Melonson. The gravity of the offense was therefore great. We are mindful of Weeden's youth and her lesser participation in the actual murder, but Melonson, the adult and the more culpable party, received a more severe sentence, life without possibility of parole.

Weeden's sentence of 25 years to life plus four years is substantially less severe than the sentences in *Graham*, *Miller*, and *Caballero*. Weeden's sentence will not keep her in prison until she dies or nears the end of her life. She will be eligible for parole at a comparatively young age, giving Weeden something to strive for and a substantial life expectancy after completing her prison term. Weeden's sentence is not tantamount to a sentence of life in prison without the possibility of parole and was not cruel and unusual punishment.

**Sentencing Errors**

Weeden alleges a variety of sentencing errors: the court improperly denied probation, the court abused its discretion in ordering consecutive sentences, and the court should have committed her for diagnostic review. According to Weeden, the court overlooked other reasonable sentencing alternatives.

### *Probation*

In denying Weeden probation, the trial court found: "The defendant is statutorily eligible for probation, and this Court has reviewed the applicable Rules of Court, and that would require this Court to find Miss Weeden's case to be an unusual circumstance to warrant the probationary sentence. [¶] In this case I do not find such circumstances and probation will be denied." The court acknowledged Weeden's lack of a criminal record, but noted "this is not the typical felony murder case where the non-shooter is substantially less culpable."

58

Under the court's analysis, the murder occurred because Weeden lured the victims to a secluded location where they could be robbed without fear of detection. Weeden actively participated in the murder and was not merely a casual participant. The court concluded the murder "involved a level of sophistication and manipulation that makes this case substantially more serious than the typical application of the Felony Murder Rule." Weeden, the court found, acted willfully and knowingly in setting up the robbery. The court found Dr. Perrine's testimony to the contrary unbelievable.

In addition, the court recounted the circumstances leading to the murder. Text messages placed Weeden at the center of a conspiracy to commit a robbery that degenerated into a murder. The victim, the court found, was vulnerable and not, as the defense suggested, a sexual predator. Nor was the victim involved in a drug transaction. The court found the testimony of the mother of victim Navnil "compelling and heart wrenching." Ultimately, the court concluded, Weeden caused the victims to be placed in harm's way through her phone calls during the night of the murder.

The court found the murder did not involve great provocation but did demonstrate criminal sophistication on Weeden's part. Citing the phone records, the court noted Weeden lured the victims to an isolated place to preclude anyone's witnessing the crime.

Although the court noted Weeden would be willing to comply with probation, while subjected to an ankle bracelet she engaged in conduct that upset her family. According to the court, Weeden "may be a little bit more manipulative and a little bit more sophisticated than those that know her the best and love her the most will accord, and in this case I find she has done that." The court denied probation.

Weeden repeats her contention that her sentence to 25 years to life in prison is unconstitutional and argues "[s]ome alternative sentence is necessary. Probation is the only statutory alternative available." We have determined Weeden's sentence does not constitute cruel and unusual punishment. Moreover, the trial court concluded this case was not the type of unusual case in which probation should be granted in the interests of

59

justice. The court reviewed the evidence and the relevant factors and determined probation was not warranted. We find no abuse of discretion in the court's denial of probation. (*People v. Stuart* (2007) 156 Cal.App.4th 165, 178-179.)

### *Consecutive Sentences*

The court ordered the sentence on the attempted robbery of Kumar to run consecutively because he was a separate victim. At sentencing, Weeden argued consecutive sentences were inappropriate because the victims' criminal activity put them in harm's way.

The court found this argument "offensive and having absolutely no basis in fact . . . . [¶] . . . I also find offensive any representation that the victims were involved . . . in any kind of drug or narcotics transaction. That is also not supported by the evidence in this case and I think only serves the purpose of dirtying the victims, when at least one of them cannot respond." In addition, the court stated: "The vulnerability of the victim. This was a 17-year-old boy, and I reject any characterization of this 17-year-old boy as being a predatory sexual offender. I find that to be offensive and having absolutely no basis in fact to make that allegation."

The court determined that but for Weeden's participation, Navnil "would not have been killed. She set up this robbery, and the text messaging and the cell phone records provide more than ample evidence for that fact." The court concluded: "We sit here today solely because Miss Weeden set up a robbery that went bad, in which she actively, personally participated in [*sic*] and to this day continues to minimize and refuses to take responsibility."

Weeden argues the court's imposition of consecutive sentences was an abuse of discretion, since the criminal activity of the victims is "precisely what placed them in harm's way." Weeden presents herself as the target of their scheme involving drugs and underage girls, and argues the court "misremembered the record" in imposing consecutive sentences.

60

The court acknowledged Weeden's argument about Navnil and Kumar's criminal activity but rejected it. Weeden presents tenuous evidence of the criminal activity: Kumar's false story in his initial police interview, Navnil's brother's testimony that the girls asked if Kumar had "weed," and the victims' alleged aim of arranging a tryst in a motel with the girls. The court heard this evidence and found it not credible. We find no abuse of discretion.

### *Diagnostic Review*

The court denied Weeden's request for diagnostic review, finding it would not benefit the court in sentencing. The court accorded very little weight to Dr. Perrine's testimony: "Dr. Perrine made it very clear in her testimony that her opinion would remain the same regardless of any additional or different facts. I find this view to be unbelievable and one that undermines the credibility and believability of the Doctor's testimony and report."

Weeden made the request under section 1203.03, subdivision (a), which provides: "In any case in which a defendant is convicted of an offense punishable by imprisonment in the state prison, the court, if it concludes that a just disposition of the case requires such diagnosis and treatment services as can be provided at a diagnostic facility of the Department of Corrections, may order that defendant be placed temporarily in such facility for a period not to exceed 90 days, with the further provision in such order that the Director of the Department of Corrections report to the court his diagnosis and recommendations concerning the defendant within the 90-day period." We review the court's ruling for an abuse of discretion. (*People v. Peace* (1980) 107 Cal.App.3d 996, 1001-1002.)

Weeden claims the court abused its discretion in denying the request, since an evaluation report would have reinforced her argument that the life sentence is wholly inappropriate. In addition, "it is incumbent on the sentencing court to be as fully informed as possible." However, the court had before it Dr. Perrine's evaluation of

61

Weeden, which the court found less than credible.  Under the circumstances we cannot find an abuse of discretion.

## DISPOSITION

The judgments are affirmed.

                                    RAYE            , P. J.

We concur:


            HULL            , J.


            BUTZ            , J.